IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| INTER-CON SECURITY SYSTEMS, INC., | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) ) ) | 1:15cv1327(JCC/IDD)
| INTERNATIONAL UNION, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA, together with its LOCAL NO. 646 | ) ) ) ) ) |
| Defendants. | ) |

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Plaintiff Inter-Con Security System, Inc.'s ("Inter-Con" or "Plaintiff") Motion for Summary Judgment [Dkt. 16].  For the following reasons, the Court denies Plaintiff's Motion for Summary Judgment and enters Judgement in favor of Defendants.

### I. Background

The following facts are taken from the parties' Local Rule 56(B) statements and are undisputed[1] unless otherwise indicated.  Inter-Con is a California corporation with its

---

[1] For ease of reference, undisputed facts are referred to by "SOF" followed by a section designation ("G" for general facts and "V" for facts specific to Mr. Volosin's case) and paragraph number consistent with their numbering in Plaintiff's statement of undisputed facts. (*See* Pl.'s Memorandum in Support [Dkt. 17], 3-15.)

headquarters and principal place of business located in Pasadena, California. (SOF, ¶ G1.) Inter-Con also maintains offices within the Eastern District of Virginia in Lorton, Virginia. (*Id.*) Inter-Con is an employer within the meaning of the Labor Management Relation Act of 1947, 29 U.S.C. § 185 ("LMRA"). (*Id.* at ¶ G2.) Defendants International Union, Security, Police and Fire Professionals of America and its Local No. 646 (collectively, "the Union" or "Defendants") are labor organizations within the meaning of the LMRA. (*Id.* at ¶ G3.) The Union maintains an office in Roseville, Michigan. (*Id.*)

Plaintiff provides security services for public and private sector clients in the United States and abroad. (*Id.* at ¶ G4.) Inter-Con holds a contract to provide security services for the United States Department of State at approximately eighty facilities including the State Department headquarters at the Harry S. Truman Building in Washington, D.C. ("Main State"). (*Id.* at ¶ G5.) Inter-Con employs approximately 200 people at the Main State site, including uniformed armed protection officers, unarmed security officers, and K-9 unit officers. (*Id.* at ¶ G6.) In addition to protecting the Main State building itself, Inter-Con is responsible for securing all of the property located inside the building, including top-secret classified materials. (*Id.* at ¶ G7.)

The Union is the exclusive collective bargaining representative for Inter-Con security officers who work at Main State. (*Id.* at ¶ G8.)  On December 15, 2013, Inter-Con and the Union entered into a collective bargaining agreement (the "CBA") that covers the bargaining unit employees at Main State.  (*Id.* at ¶ G9.)  Article 23.1 of the CBA, titled "Management Rights", reads as follows:

> The Management and operation of the business of Employer and the direction of the workforce are rights vested exclusively in Employer, unless expressly abridged by the terms of this Agreement.  These rights include, but are not limited to, the following:
> A.   Making and enforcing rules to assure orderly and efficient operations.
> B.   Determining Employee's qualifications and competencies and the right to hire, transfer, promote or demote.
> C.   Suspending and discharging.

(CBA, Pl.'s Ex. 1, Attach. D, [Dkt. 17-5] at 51.)  Article 14.1 of the CBA, titled "Discipline/Discharge for Just Cause", provides as follows:

> Employees may be disciplined or discharged for just cause.  In the event of a discharge or disciplinary action by the Company, the Employee will be given a written reason for the Employee's discharge or disciplinary action.  Upon receiving the written reason for the disciplinary action, the Employee will be provided with an opportunity to respond to the charge in writing.  In the event of disciplinary action by the Company, in which the Company requests the presence of the Employee, the Employee will be provided Union representation if it is requested by the Employee.  The Company agrees to give the Union two (2) business days to arrange for a Shop Steward or other Union Official to attend the meeting.

3

In the event of a discharge or disciplinary action by the Company, the Company will give the Employee notice of the violation prior to the issuance of official discipline in the form of a "Notice of Violation." The notice of violation is not disciplinary action.  The Employee will have the opportunity to respond to the charge in writing on the "Notice of Violation" form. The Company will take a written Employee response into consideration when reviewing the incident and determining if official discipline is warranted.

Should it be determined that discipline is warranted at the level of a suspension based on the Inter-Con Services Corporation Policy Statement of Disciplinary Action, the Company will notify the Employee of the suspension in writing.  Upon final determination of disciplinary action, every effort will be made to schedule an Employee's suspension in a timely fashion, however, suspensions will be scheduled in a manner that minimize financial and operation impact to the Company.

(*Id.* at 43.)  Article 6.8 sets forth an arbitration procedure for the resolution of grievances, providing:

**6.8 Arbitration Procedure**

Grievances that have been timely processed in accordance with the requirements of the previous paragraphs and remain unsettled shall be processed in accordance with the following procedures and limitations.

\*\*\*

**6.8.5 Arbitrator's Decision**

The decision of the arbitrator shall be final and binding upon the parties to the agreement.  The decision of the arbitrator shall be rendered as soon as possible after the dispute has been submitted.  Any decision made by the arbitrator shall be complied with without undue delay.  It is understood and agreed to by the Union and the Company that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

4

(*Id.* at 23-24.)

The federal government requires that Inter-Con employees assigned to Main State must disclose whether they have ever been arrested, detained, or issued a traffic ticket over $150, and if so, to describe the circumstances. (SOF, ¶ G13.) The State Department periodically reviews each employee's criminal background information maintained by the FBI in the National Criminal Information Center ("NCIC"). (*Id.*) Plaintiff maintains that State Department policy, as expressed by State Department officials, is that "no one with an NCIC hit, regardless of disposition, can hold a special deputation," and any officer who fails to disclose an NCIC hit must be removed from the State Department assignment. (Pl.'s Ex. 1, Attach. J [Dkt. 17-11].) Defendants contend that Inter-Con in fact had significant discretion over whether to accept the explanation of an employee who failed to disclose a prior arrest and that the State Department relied on Inter-Con's judgment as to whether or not that employee would be removed from the State Department contract. (Pl.'s Ex. 1, Attach. B at 75-76, 100-102.) Plaintiff admits that in practice, the State Department has authority to allow officers with prior arrests to retain their special deputations on a case-by-case basis. (*Id.* at 70-73.)

Inter-Con requires all employees assigned to Main State to sign the following statement regarding the Disclosure of Adverse Information (the "Adverse Action Policy"):

> I, [employee name], understand that I must immediately disclose adverse information, specifically arrests, detainments, or traffic violations with fines exceeding $150.00, to the Inter-Con Project Manager at [telephone number] and the Facility Security Officer (DPM/A) at [telephone number]. If during the National Criminal Information Center (NCIC) checks conducted by the Office of Domestic Facilities Protection, or any other means other than my disclosure, it is discovered that I have failed to report **any** arrest or detainment for any felony or misdemeanor charge or **any** traffic violation with fines exceeding $150.00, regardless of the disposition of the charge, my employment will be terminated.

(Pl.'s Ex. 1, Attach. G, H, and I (emphasis in original).) The penalties for failure to disclose an adverse action in accordance with the Adverse Action Policy are elaborated upon in the Inter-Con Security Systems, Inc. Policy Statement for Disciplinary Actions ("Disciplinary Policy"). (SOF, ¶ G18.) The Disciplinary Policy provides in relevant part that failure to disclose in accordance with Adverse Action Policy will result in the following discipline:

> 1st time: Suspension pending investigation. Reinstatement unless prohibited by law or Termination based on evaluation of the incident and in accordance with the contract adverse action policy.

(Pl.'s Ex. 1, Attach. F.) The Disciplinary Policy is incorporated into the Collective Bargaining Agreement by reference.

6

On June 28, 2012, James Volosin applied to work for Inter-Con as a K-9 Officer at the State Department. (SOF, ¶ V1.) At the time of his application, Volosin was employed as a civilian K-9 handler for the Marine Corps Law Enforcement Program at Quantico. (*Id.* at ¶ V2.) Volosin disclosed on his application that he had been arrested for domestic assault in 1998, but he did not disclose any other arrests or adverse actions. (*Id.* at ¶ V3.) Inter-Con hired Volosin and assigned him to work at Main State as a K-9 handler, a position requiring a special deputation and a top secret clearance. (*Id.* at ¶ V4.) At the time of his hire, Volosin signed a copy of Inter-Con's Adverse Action Policy, acknowledging his ongoing obligation to disclose all past and current arrests, detainments, or traffic tickets over $150. (*Id.* at ¶ V5.) Volosin signed copies of the Adverse Action Policy during his annual refresher trainings in August 2012 and July 2013. (*Id.*)

On June 24, 2014, the State Department notified Inter-Con's Vice President for Operations for the State Department Contract, Ronald D. Libby, that Volosin and several other officers had "hits" on their NCIC records. (*Id.* at ¶ V6.) The notice stated:

> Please ensure that none of these officers hold Special
> Deputation. If they do, withdraw it immediately. It
> is our policy that no one with an NCIC hit, regardless
> of disposition, can hold a special deputation. If

they failed to disclose then remove them from the contract.

(Pl.'s Ex. 1, Attach. J.)  Inter-Con then requested and received permission from the State Department to review Volosin's NCIC criminal background records.  (SOF, ¶ V7.)  The NCIC report indicated that on June 26, 2012, while working as a K-9 handler at Quantico, and only two days before he applied to work for Inter-Con, Volosin had been arrested and charged with theft of government property in violation of 18 U.S.C. § 641, and with a crime occurring within a special maritime and territorial jurisdiction in violation of 18 U.S.C. § 661.  (*Id.*)  Volosin did not disclose this reported arrest to Inter-Con in his job application or in the subsequent Disclosure of Adverse Information forms he signed at his annual refreshers.  (*Id.* at ¶ V8.)  Inter-Con gave Volosin an opportunity to explain his non-disclosure, at which point he asserted that he had not been arrested and that the NCIC record was the result of a miscommunication.  (*Id.* at V9).  Inter-Con asked Volosin to submit a statement, and Volosin agreed to provide one.  (*Id.*)

On June 24, 2014, Volosin submitted a statement acknowledging that he had an arrest on his record from June 2012, but denying any knowledge of an arrest prior to its discovery by the State Department.  (*Id.* at ¶ V10.)  Volosin claimed that he met with the Criminal Investigation Division at

Marine Base Quantico to answer some questions regarding a missing refrigerator, but asserted that he was repeatedly told that he was not being placed under arrest at that meeting. (*Id.*)  Volosin invoked his Fifth Amendment right not to answer any questions during his interview with CID.  (*Id.*)  Volosin had his fingerprints taken during the meeting with CID, but he claimed that when he asked why, he was told that it was standard operating procedure.  (*Id.*)  Volosin claimed that the entire incident with CID was the result of the military retaliating against him for having filed a grievance and having complained about a Marine officer at Quantico.  (*Id.*)  Volosin promised Inter-Con that he would produce corroborating statements, and apologized "for the miscommunication in the matter."  (Pl.'s Ex. 1 Attach. L.)

Libby informed the State Department that Volosin was claiming that the NCIC "hit" was in error, and that Inter-Con wanted to give Volosin the opportunity to mitigate the report. (*Id.* at ¶ V.13.)  The State Department allowed Volosin to retain his special deputation pending the outcome of the investigation. (*Id.*)

Volosin subsequently produced a statement dated June 26, 2014 from Curtis Caram, a friend of Volosin who had worked with Volosin at both Quantico and at the State Department.  (*Id.* at ¶ V14.)  Caram verified that CID had interviewed Volosin

9

regarding a missing refrigerator, but claimed that the arrest report "had to be some sort of verbiage error or technical fluke." (Pl.'s Ex. 1, Attach. R.)  Caram also claimed that the Marine Commanding Officer at Quantico harbored an animus against civilian law enforcement personnel on the base. (*Id.*)  Caram asserted that the Commanding Officer "didn't feel that civilians had any right to enforce law when it came to Marines" and that the Commanding Officer "was prepared to do everything he could do to rectify the situation and remove Volosin." (*Id.*)

Volosin also produced a statement dated June 27, 2014 from Stephen F. DiEgidio, a union steward who had accompanied Volosin to his interview with CID. (Pl.'s Ex. 1, Attach. Q.) DiEgidio stated that CID had read Volosin his rights and fingerprinted him, Volosin asserted his Fifth Amendment right not to answer any questions, and CID told Volosin that he was not being charged or arrested. (*Id.*)  DiEgidio concluded by stating his belief that the Marine Corps orchestrated the entire incident in an attempt "to damage [Volosin's] career." (*Id.*)

Volosin further produced a short undated statement from an individual named Stephen Gowing, who indicated that he had heard that CID agents at Quantico "were accidentally making incorrect entries in the system" by recording interrogations as arrests. (Pl.'s Ex. 1, Attach. R.)

10

Finally, Volosin produced a letter from John Spencer, an attorney in Fredericksburg, Virginia, stating that he had spoken with Volosin and Spencer believed that the arrest record "sounded like a paperwork mix-up." (Pl.'s Ex. 1, Attach. M.) Spencer further stated that he had referred Volosin to local attorney and former JAG officer Jason Pelt to rectify the matter. (*Id.*) Inter-Con did not hear anything further from attorneys Spencer or Pelt. (SOF, ¶ V17.)

Inter-Con considered the statements submitted by Volosin, but concluded that they did not establish that the NCIC arrest record was made in error. On August 19, 2014, after giving Volosin approximately two months to submit additional evidence, Inter-Con informed Volosin that he could either resign, or they would begin the termination process against him. (*Id.* at ¶ V19.)

On September 4, 2014, the Union filed a grievance asserting that Volosin had been forced to resign, amounting to a discharge without just cause. (*Id.* at ¶ V21.) After initiating the grievance process, the Union presented Inter-Con with a letter dated October 1, 2014, purporting to be from a Paralegal special at the Naval Criminal Investigative Service named Tracy Ogren. (*Id.* at ¶ V22.) The letter states that the United States Marine Corp CID had reported Volosin to the NCIC pursuant to its obligation to submit "data" regarding individuals being

11

investigated for felony violations.  (*Id.*)  It states that on
June 7, 2012, the CID opened a larceny investigation regarding
the suspected theft of a government-owned refrigerator and dog
food intended for use by the Military Working Dogs Program, that
Volosin invoked his Fifth Amendment rights after having been
advised of them, and that the CID declined to take any formal
action after Volosin submitted his letter of resignation.  (*Id.*)
Additionally, the letter states that Volosin "was never arrested
or detained by the USMS CID as a result of the 2012 USMC CID
investigation." (Pl.'s Ex. 1, Attach P.)  The Ogren letter does
not attempt to explain why CID reported that Volosin had been
charged and arrested, nor does it indicate that CID would take
any steps to change the NCIC record.  (SOF, ¶ V23.)  Indeed, at
the time of the arbitration in June 2015, the NCIC records still
showed that Volosin had been arrested by CID.  (*Id.*)  Libby did
not believe that the Ogren letter was conclusive evidence that
Volosin had not been arrested.  (*Id.* at ¶ V25.)  Libby presented
the Ogren Letter to the State Department Contracting Officer's
Representative Bill Evans, who also indicated that it did not
change his opinion regarding Volosin's NCIC hit.  (*Id.*)

        The Union then filed a demand for arbitration.  (*Id.*
at ¶ V26.)  An evidentiary hearing was held on June 10, 2015
before Arbitrator Carl F. Jenks ("the Arbitrator").  (*Id.*)
During this hearing, both parties presented evidence and

arguments in support of their respective positions. (*Id.*)
Volosin testified at his arbitration hearing that he applied for
a position with the Defense Intelligence Agency ("DIA") in April
or May of 2014, shortly before Inter-Con learned about his NCIC
hit. (*Id.* at ¶ V24.) DIA initially offered Volosin a position,
but eventually rescinded the offer based on its own background
check. (*Id.*)

The Arbitrator issued his Award on September 25, 2015.
(*Id.* at ¶ V27.) The Arbitrator accepted that the Adverse Action
Policy was part of Inter-Con's work rules and policies and had
been incorporated into the governing CBA. (Pl.'s Ex. 1, Attach.
A ("Award") at 14.) He concluded that Inter-Con had violated
the CBA by terminating Volosin without "just cause", as required
by Article 14.1 of the CBA. (*Id.*) The Arbitrator held that
"the evidence clearly shows that Inter-Con did not investigate
sufficiently to establish that the Grievant had done anything
more than take part in a CID investigation." (*Id.*) The
Arbitrator went on to explain that in establishing just cause:

> The burden is rightly placed on Inter-Con to
> provide clear and convincing proof that the
> Grievant was actually guilty of a criminal
> offense that resulted in an arrest record in the
> NCIC database. The mere fact that there is an
> entry does not automatically signify that every
> element of that entry is accurate, nor does it
> prove the existence of an actual arrest without
> corroborating evidence substantiating it.

(*Id.*) The Arbitrator went on to explain in his finding that:

> [a]s the employer, Inter-Con had a duty to prove
> the allegations upon which [Volosin] was
> terminated pursuant to the just cause requirement
> in Article XIV, Section 14.1 of the [CBA].
> Inter-Con's attempt to force [Volosin] to prove
> his own innocence is tantamount to abandoning the
> Bill of Rights: "Innocent until proven guilty."

(*Id.* at 15.)  Ultimately, the Arbitrator held that the evidence presented by Volosin, especially the Ogren letter and the fact that a previous ProVerify background check on Volosin did not reveal any unreported adverse incidents, "require Inter-Con to at least conduct further investigations of its own." (*Id.*) Holding that Inter-Con's termination of Volosin violated the just cause requirement of Article XIV, Section 14.1 of the CBA, the Arbitrator sustained Volosin's grievance and ordered Inter-Con to reinstate Volosin with back pay.  (SOF, ¶ V32.)

On October 13, 2015, Inter-Con brought this lawsuit to vacate the Arbitration Award pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185.  On January 29, 2016, Inter-Con filed the motion for summary judgment now before the Court.  The parties agree that there are no material issues of fact in this case.  Both parties have briefed their positions, oral arguments were heard on April 7, 2016, and the case is now ripe for decision.

## II. Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled

14

to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Where, as here,

neither party disputes the material facts, the case is ripe for

disposition on summary judgment.[2]  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1998).

      "Judicial review of a labor-arbitration decision"

pursuant to a collective bargaining agreement "is very limited."

*Major League Baseball Player's Ass'n v. Garvey*, 532 U.S. 504,

509, (2001)(per curiam).  In fact, "[j]udicial review of

arbitration awards is. . . 'among the narrowest known to the

law.'"  *PPG Indus., Inc. v. Local 45C, Int'l Chem. Workers Union*

*Council,* 587 F.3d 648, 652 (4th Cir. 2009)(quoting *U.S. Postal*

*Serv. V. Am. Postal Workers Union,* 204 F.3d 523, 527 (4th Cir.

2000)(in turn quoting *Union Pac. R.R. v. Sheehan*, 439 U.S. 89,

91 (1978))).  This deference results from the fact that "the

federal policy of settling labor disputes by arbitration would

be undermined if the courts had the final say on the merits of

the awards."  *United Steelworkers of Am. v. Enterprise Wheel and*

*Car Corp.*, 363 U.S. 593, 596 (1960).  The deference due to the

arbitrator is such that "[a]s long as the arbitrator is even

arguably construing or applying the contract and acting within

the scope of his authority, that a court is convinced that he

---

[2] The parties in this case have agreed that this case can be
resolved at this stage as a matter of law.  (Consent Motion to
Vacate Final Pretrial Conference [Dkt. 22], ¶ 4.)

committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 30 (1987).  In other words, "[a] court reviewing a labor arbitration award is limited to 'determin[ing] only whether the arbitrator did his job - not whether he did it well, correctly, or reasonably, but simply whether he did it.'" *Washington Gas Light Co. v. Int'l Broth. Of Teamsters, Local 96*, 594 Fed. App'x 774, 777 (4th Cir. 2014)(quoting *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996)).

However, an arbitration award is entitled to deference "only so long as it draws its essence from the collective bargaining agreement." *United Mine Workers of Am. v. Marrowbone*, 232 F.3d 383, 388 (4th Cir. 2000)(quoting *United Steelworkers*, 363 U.S. at 597); *accord Island Creek Coal Co. v. Dist. 28 United Mine Workers of Am.*, 29 F.3d 126, 129 (4th Cir. 1994).  The Court must overturn an arbitration award which "fails to draw its essence from the collective bargaining agreement or reflects the arbitrator's own notions of right and wrong." *Mountaineer Gas,* 76 F.3d at 608.  "The arbitrator cannot 'ignore the plain language of the contract' to impose his own notions of industrial justice.'" *PPG Indus., Inc.* 587 F.3d at 652 (quoting *Misco,* 484 U.S. at 38).

In determining whether an arbitrator acted within the scope of his authority under a collective bargaining agreement, the court examines: "(1) the arbitrator's role as defined by the [agreement]; (2) whether the award ignored the plain language of the [agreement]; and (3) whether the arbitrator's discretion in formulating the award comported with the essence of the [agreement's] proscribed limits." *Marrowbone*, 232 F.3d at 388 (quoting *Mountaineer Gas,* 76 F.3d at 608).

### III. Analysis

While the Arbitrator's Award contains some highly dubious legal analysis and demonstrates confusion on several foundational aspects of criminal law, the award does draw its essence from the CBA, does not ignore the plain language of the CBA, and is based upon the arbitrator's interpretation of an arguably ambiguous term in the CBA.  Accordingly, the Court will deny the Plaintiff's motion for summary judgment and will affirm the Arbitration Award.

The Arbitrator's role as defined by the CBA is to render a final and binding decision in grievances between Inter-Con and the Union after holding a hearing on the matter.  (Pl.'s Ex. 1, Attach. D at 23-24.)  The Arbitrator's power is not limitless, however, as the CBA provides that "[i]t is understood and agreed to by the Union and the Company that the arbitrator shall have no power to add to, subtract from, or modify any of

17

the terms of this Agreement." (*Id.* at 24.)  Where the terms of the CBA are ambiguous, however, the Court must defer to the interpretation of the arbitrator.  *United Steelworkers* 363 U.S. at 599.

The CBA here is ambiguous as to what constitutes "just cause" for termination of an employee by Inter-Con.  The Disciplinary Policy clearly provides for some level of managerial discretion in deciding whether or not to terminate an employee for their first violation of the Adverse Action Policy. Article 14.1 of the CBA provides that "[e]mployees may be disciplined or discharged for just cause." (CBA, Pl.'s Ex. 1, Attach. D, at 51.)  The rules promulgated by Inter-Con pursuant to their reserved power in Article 23.1 of the CBA to "[m]ak[e] and enforce[e] rules to assure orderly and efficient operations" provide some context as to what constitutes "just cause." However, these rules do not require automatic termination for a first-time violation of the Adverse Action Policy.  By its own terms, the Disciplinary Policy provides that the punishment for a first violation of the Adverse Action Policy will be "[s]uspension pending investigation," followed by "Reinstatement unless prohibited by law *or* Termination based on evaluation of the incident and in accordance with the contract adverse action policy."  (Pl.'s Ex. 1 Attach. F. (emphasis added))

This case is therefore easily distinguishable from *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996). In *Mountaineer Gas* the Fourth Circuit held that because the Employer's drug policy unambiguously required termination for a first-time offense, an arbitrator's award requiring reinstatement of an employee who had violated the drug policy "blatantly ignored the unambiguous language of the drug policy and fashioned a penalty that appealed to his own notions of right and wrong." *Mountaineer Gas*, 76 F.3d at 610. The Disciplinary Policy in this case clearly provides for managerial discretion in determining whether to terminate a first-time offender. This discretion, read in conjunction with the just cause requirement of the CBA, is enough to create ambiguity in the contract as to how much investigatory work is required to determine that a termination-worthy violation of the Adverse Action Policy has occurred.[3] Accordingly, because the CBA, the Adverse Action Policy, and the Disciplinary Policy are ambiguous as to how much investigation Inter-Con was required to conduct prior to termination for

---

[3] The language of the CBA is certainly sufficient to create ambiguity in the context of a labor arbitration award, where the Court must watch for ambiguity with the vigilance of the mythical Argos. *See Washington Gas Light Co.,* 594 Fed. App'x at 778 (holding that a provision of the CBA entitling either party to strike the arbitrator "not later than 24 hours before the time the arbitration hearing is scheduled to begin" to be sufficiently ambiguous to require deference to the arbitrator).

violation of the Adverse Action Policy, the Court must defer to the interpretation of the Arbitrator.

Plaintiff contends that the Arbitrator exceeded his contractual authority and acted in disregard of the CBA by holding "that Inter-Con may not discharge an employee for failing to disclose an arrest without 'clear and convincing proof that the [employee] was *actually guilty* of a criminal offense that resulted in an arrest record in the NCIC database." (Pl.'s Mem. in Supp. at 17. (quoting Award))  If this were the extent of the Arbitrator's holdings on the issue of just cause, it would clearly conflict with the language of the Adverse Action Policy, which is incorporated into the CBA through Inter-Con's Disciplinary Policy.  The Adverse Action Policy states that an employee will be discharged if he or she fails to disclose an arrest "regardless of the disposition of the charge." (Pl.'s Ex. 1, Attach. G.)  The Adverse Action Policy explicitly addresses arrests, not convictions.  Inter-Con is unambiguously not required to prove a criminal violation in order to show a violation of the Adverse Action Policy.  An unreported arrest would plainly violate the Adverse Action Policy even if the employee were wholly innocent of the alleged underlying offense.

However, when viewed in light of the remainder of the Arbitrator's holdings on the issue of just cause, it becomes

apparent that that single problematic sentence is merely a confused and inartful detour on the road to an otherwise permissible interpretation of the CBA's requirements.  The very next sentence of the Arbitrator's Award provides, "[t]he mere fact that there is an entry does not automatically signify that every element of that entry is accurate, nor does it prove the existence of an actual *arrest* without corroborating evidence substantiating it." (*Id.*)(emphasis added)  Additionally, the Award later makes clear that it is "doubt about the accuracy of the NCIC arrest report," not doubt about whether Volosin actually committed the crime for which he was allegedly arrested, that served as the basis for the award.  (*Id.* at 16.) While the Arbitrator wrote that Inter-Con must "provide clear and convincing evidence that the Grievant was actually guilty of a criminal offense that resulted in an arrest record in the NCIC database," the remainder of the Award clearly demonstrates that he meant that Inter-Con must provide clear and convincing evidence that the Grievant had actually been arrested, resulting in an arrest record in the NCIC database.  While casually confusing an arrest with a conviction would be catastrophic on a first-year criminal law exam, it is not fatal to the Award's otherwise permissible interpretation of what the "just cause" requires under the CBA.

Plaintiff also contends that the Arbitrator exceeded his contractual authority by ignoring the Adverse Action Policy and replacing it with his own vision of how corporate discipline at Inter-Con should function. (Pl.'s Mem. at 19.) While Plaintiff is correct that the Arbitrator's Award does not explicitly mention the text of the Adverse Action Policy in its discussion of just cause, the Award does reference Inter-Con's Disciplinary Policy, specifically the portion which provides that the punishment for a first time violation of the Adverse Action Policy is "[r]einstatement unless prohibited by law or Termination [sic] based on evaluation of the incident and in accordance with the contract adverse action policy." (Award at 15.) The Arbitrator held that this portion of the disciplinary policy, in conjunction with the just cause requirement of the CBA and the Adverse Action Policy, provided that termination of employment for a first violation of the Adverse Action Policy could only be "based on a purposeful 'evaluation of the incident.'" (*Id.*) This interpretation was not untethered from the text of the CBA and the Disciplinary Policy, but was firmly rooted in the text of the CBA.[4]

---

[4]   The Arbitrator's statement that "Inter-Con's attempt to force the Grievant to prove his own innocence is tantamount to abandoning the Bill of Rights: 'Innocent until proven guilty'" is pure dicta. (Award at 15.) This passing comment by the Arbitrator was not an attempt to substitute his own flawed understanding of the Bill of Rights for the CBA's just cause

Finally, Plaintiff argues that the Arbitrator exceeded his contractual authority by holding that an NCIC arrest entry "does not automatically signify that every element of that entry is accurate, nor does it prove the existence of an actual arrest without corroborating evidence substantiating it." (Award at 14.) Plaintiff argues that because the Adverse Action Policy clearly provides that NCIC checks will be used to look for evidence of prior arrests, an NCIC "hit" must be considered conclusive evidence of a prior arrest. This argument holds no water. The Adverse Action Policy provides that an NCIC check will be used as an investigative tool to look for prior, unreported arrests. Nowhere does it provide that an NCIC "hit" will be treated as conclusive evidence that an arrest occurred. Rather, the Adverse Action Policy provides that if, "during the National Criminal Information Center (NCIC) checks conducted by the Office of Domestic Facilities Protection, or through any other means other than my disclosure, it is discovered that I have failed to report **any** arrest . . ." the employee will be subject to discipline. (Pl.'s Ex. 1, Attach. G. (emphasis in original))

---

provision and Inter-Con's policies. It was merely another instance of the Arbitrator's pseudo-legal analysis and showy profundities momentarily distracting him from his ultimately permissible result.

By its own terms, then, the Adverse Action Policy contemplates some investigation or other means of learning about a prior arrest outside of an NCIC report.  Additionally, it is not an unreported NCIC "hit" which subjects the employee to discipline under the terms of the Adverse Action Policy, but a prior arrest.  Just as an unreported prior arrest would be sufficient to trigger discipline under the Adverse Action Policy even without an accompanying NCIC entry, so an errant NCIC entry which incorrectly reports an arrest where none occurred would not justify discipline under the Adverse Action Policy.  That, at least, is an arguably valid interpretation of the role of the NCIC in the Adverse Action Policy, and it is the one which underpins the Arbitrator's Award in this case.

Accordingly, because the Arbitrator's Award drew its essence from his arguably permissible interpretation of the CBA and Inter-Con's policies rather than from his occasional misadventures into the realms of criminal and constitutional law, the Court must defer to his interpretation and affirm the Award.

## IV. Conclusion

For the foregoing reasons, the Court denies the Plaintiff's Motion for Summary Judgment, affirms the Arbitrator's Award, and enters judgment in favor of the

Defendant.   An appropriate order will issue.


|                        | /s/                                   |
|------------------------|---------------------------------------|
| May 5, 2016            | James C. Cacheris                      |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE    |